Good morning. Jeffrey Jones. Jeffrey Jones for the appellant, Peter Reed. I'd like to reserve two minutes for rebuttal, if I may. All right. Watch the clock. The central question in this case is whether the – I'm sorry, what did you say? Watch your clock. I will. As you saw the last – you can go back to 10. The last person went over by not watching her clock, so they didn't save their time. Thank you. The central question in this case is whether one of the chief investigating officers on the case, Detective Lowe, acted in bad faith when he seized, then lost or destroyed, 9mm ammunition that he found in the apartment of the homicide victim, Alvarez. In Arizona v. Youngblood, the Supreme Court stated, in cases like this one, where evidence has been lost or destroyed, the presence or absence of bad faith by the police must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed. And you agree that bad faith is a factual determination by the district court? I believe it is a factual determination. Okay. So what would be our standard of review? Both taking into account that it was a factual reference and taking into account the EDPA standards and taking into account the criteria of bad faith, bad faith being the ultimate substantive standard. When you add all those together, what is, do you think, our ultimate standard of review? I think the ultimate standard of review is simply the EDPA standard. The factual finding by the state court has to be objectively unreasonable. On a habeas case, this court reviews the district court de novo. The district court was applying the EDPA standard to determine whether the California Court of Appeals decision was unreasonable. And on habeas, there's a de novo review from this court to the district court. And I believe this court is applying the EDPA standard of whether the state court's factual finding of good faith was objectively unreasonable. So that's really a problem in terms of your appeal because of the highly deferential standard. What I'm wondering about is there, do you have some case law or anything, anything that would support a reversal of the district court without the necessity of having to reverse the good faith finding by the state courts? No. I think examining the, I hope this answers your question. I think examining the Supreme Court precedent that's at issue here, Arizona v. Youngblood, this case hinges on a finding of bad faith by the police officer. Now, the state courts have found good faith. And I'm asking this court to rule that that finding by the state courts was unreasonable under the standard in 2254. All right. So why? So tell us your arguments why it was unreasonable. Well, the argument is, first, primarily, the state court, a premise of the state court's decision, that this was in good faith, was that this evidence wasn't obviously exculpatory. And I think we assume that. Otherwise, it wouldn't be a Youngblood analysis, would it? If it were obviously exculpatory, we wouldn't be using Youngblood. We'd use Trambata. Trambata? No, I think that, well, if it's not, if the evidence, if the evidence isn't obviously exculpatory from the perspective of the officer, then the claim that Pellon is raising under Youngblood loses. No, but wouldn't you have a Brady claim that if it was obviously exculpatory that he had an obligation to turn it over? Mm-hmm. But you don't make a Brady claim. Well, I can't, Brady, this is a Brady claim in the sense it's an Arizona v. Youngblood claim which applies Brady in situations where the evidence no longer exists. And that's what this is. I think that's what it has to be. But you're not arguing that it's obviously exculpatory? I just heard you argue that it was. It is, indeed. The evidence that he lost or concealed from what we know of it, from all we can know of it, would have been obviously exculpatory to an officer in his position at that time based on what he knew, which is the question that Arizona v. Youngblood asks. Now, the officer testified. I saw this ammunition. I didn't think it was relevant in the case. But what he found, first of all, if I may go through this really quickly, first of all, what he knew was he knew that the victim and Mr. Reed had engaged in mutual combat, that both men had been shot, that the victim had been shot at close quarters during that mutual combat. Several times. Several times, yes. Three times. Yes, that's right. Three times. And Mr. Reed shot once. He also knew that the 9mm pistol that was indisputably the weapon that killed Alvarez, the victim, he knew that that wasn't registered to either man, and he knew that Mr. Reed didn't he denied owning it or possessing it prior to the fight. Then what he finds in the apartment of the victim is he finds two pistols that are .40 caliber with .40 caliber ammunition to match that can be shot from those weapons. He also finds 9mm ammunition with no corresponding 9mm weapon. In the mind of any reasonable officer, that would raise the question, where is the 9mm pistol to match that 9mm ammunition? Now, he testifies, I didn't think that was relevant. And I think that's, in and of itself, that's incredible testimony under any standard. Well, there's more to the facts, correct? In order to demonstrate bad faith and to prevail on this claim, you'd have to show that there was a conscious effort to suppress evidence on behalf of that particular officer or detective, and the state court made very specific findings as to why it did not believe that the conduct was tantamount to a conscious effort to suppress evidence, including the fact that the victim's wife, Mrs. Narrows, was the one who initiated the contact with the detective. It wasn't the other way around. The detective made an effort to give her a receipt, which undercut the argument or notion that he would purposely conceal the evidence. His testimony, which you indicated was not believable, that he didn't think it was relevant. But the state court also talked about the fact that, really, the argument that there's obvious exculpatory value is overstated, because even had the 9mm bullets been available, it really wouldn't exonerate the petitioner at trial. And, in fact, during the course of the trial, the defense got free reign in terms of cross-examining the detective on his conduct with regard to those missing 9mm bullets. You have to view all that in context, plus through the highly deferential lens of the review. I think all of those bases are entirely specious, Your Honor. And how so? The fact that the victim, that Mrs. Narrows contacted Detective Lowe, the question for his bad faith, for his state of mind, is what he did once he saw the 9mm ammunition. That was the exculpatory evidence. He had no way to know there was any 9mm ammunition until she called him up. I don't think he had bad faith when he necessarily went to her apartment. That's not the question. And he opened the toolbox. It's when he opened the toolbox that he saw there's 9mm ammunition and no 9mm pistol, and the other two matching ammunition and matching pistol for the .40 caliber. That's when the bad faith arises. So her context, it's what he did, it's what he was thinking once he saw the exculpatory evidence, not what he was thinking before he saw it and didn't know it existed. The notes he wrote. The notes aren't in the record. But there is evidence in the record what those notes contained. And they were cryptic. First, they were his personal notes. They weren't intended for the eyes of the defense. So when he wrote them, he didn't think the defense or the prosecution would ever see those notes. They were obtained by a special request from the defense. And it shows in the record that those notes, they didn't say who he got the weapons from. They didn't say anything about the transaction except it listed two pistols. And it was out of sequence, too, wasn't it? Yeah. There was no date at all on it. I mean, so it didn't follow automatically as you would chronologically enter it from prior notes. It was evidently it was between two pages that were in January, and this transaction occurred in July. Right.  So it's a toss-up as to when it occurred. If you assumed, you would assume January, and that wasn't it. Okay. But it didn't have a date. So it was only by the defense looked at the serial numbers in these two weapons. It didn't say anything that he got it from the murder victim or any of that. It said just two pistols and two serial numbers. The defense compared those serial numbers to firearm registration for the victim and then figured out what happened. The prosecution had no idea. The defense then took that information to the prosecution, and by all accounts the prosecution was very professional and very helpful in getting to the bottom of the matter. While this case was being investigated, did the department know or think they know, did they have a strong theory who owned that gun or how it was brought to the altercation? I think, well, their theory was clearly that it was Mr. Reed's gun. It was a stolen weapon. It wasn't registered to him. It was registered to someone in Georgia, and it had been stolen. And clearly the state's theory was that Mr. Reed possessed the weapon prior to the fight. So at the time that Mr. Lowe went there, to the extent he knew about how that operation, the investigation was proceeding, the assumption was that gun was probably Mr. Reed's. Yes, absolutely. I'm sure he believed the weapon was Mr. Reed's. His bad faith would be when he saw evidence that contradicted that proposition. Why wasn't it cured? Why wasn't the problem cured by the judge's instructions that the jury was told that they did find ammo of that match at the house? The jury, Detective Lowe was cross-examined at trial. Actually, he was a defense witness at trial. And that evidence came out. The jury learned. The jury was, and during closing argument, the defense counsel made that argument. That evidence was before them that there was 9mm ammunition and tried to infer from that the victim rather than Mr. Reed on the 9mm pistol. However, what the defense was deprived of is the ability to examine that ammunition, and the potential exculpatory value of this evidence that's been destroyed by the state is that, one, if it was actually spear ammunition and it matched the, that creates much stronger inference. And the defense was denied the ability to, the opportunity to examine this ammunition that was found in Mr. Alvarez's apartment for other identifying, for more specific identifying characteristics. For instance, I'm no firearms expert, but it's in the record that bullets have expiration dates. Now, if something, some manufacturer marking like that was evident and could link the bullets at the crime scene to the bullets found in the apartment, then you have a much, much stronger evidence, much, much stronger inference than the jury was, than what was given to the jury. So they had the gun and they had the bullets and they had evidence, testimony that identical bullets were found in the victim's house. Bullets of the same caliber. But there was no, there was no testimony at all regarding the brand. So when you're, so you're also challenging the state court's conclusion that the remedy imposed, the remedy imposed by the state trial court ensured the defendant a fair trial. Yes, absolutely. Absolutely. So is that a legal conclusion? And is that contrary to establishing? I think, I believe it goes to a prejudice analysis. I believe that, I mean, it's not that I'm, definitely the state, the state court of appeals used, relied on that to conclude, well, there wasn't any prejudice here anyway. And I believe that's, I believe that's incorrect, though. This court implying a prejudice analysis, I believe, would apply, ordinarily would apply Brecht, but in this case, it would be the Brady, the Brady standard of materiality, I believe, applies on habeas. So just to make sure I understand your argument, the prejudice that flowed from the missing 9-millimeter bullets would be, your best case scenario would be that if the 9-millimeter bullets had been turned over to defense, it might have been the same brand as the bullets that killed the victim. And so the defense could then use that commonality to argue to the jury that the gun, in fact, belonged to the victim and not to the decedent. The same brand and potentially more specific identifying characteristics. For instance, let's say they're all, that all the bullets involved at the crime scene and in the apartment were all spear brand. We know there was spear at the crime scene. Then were they spear brand that did all, that bore in common some identifying characteristics, such as an expiration date, a serial number, some identifying characteristic, that's more specific and creates a stronger inference than the commonality of the brand. So even at trial, what was the government's theory there about whose gun that was? At trial, the government's theory was very much that it was Mr. Reed's firearm, that he brought it, that he possessed it. He had it in his pocket and he pulled it out during the fight. And the state court remedy was to preclude the officer who found the 9-millimeter bullets from lying that he found bullets of a different caliber. They didn't allow him to testify. He had a belief that the bullets that he found in the apartment were Remington and not spear. And he was not allowed to testify to that belief. So he was going to use that to bolster the prosecution's theory. Well, it was his basis. It was his basis. It was his stated basis for when he found the bullets, saying, well, I didn't think they were relevant to this case because they weren't spear. They were Remington. But the prosecution had the gun, right? What was the gun? Yes. The gun was found at the crime scene. It was found at the time of the crime. It was found near the crime scene. What kind of gun was it? It was a 9-millimeter pistol. A Lorsen. A Lorsen 9-millimeter pistol. A Lorsen. Okay. But, of course, the brand of the bullets and the brand of the gun don't have any relationship. But when we're evaluating good faith, then even though he couldn't testify to the jury about it, we have to take into account his unrefuted testimony that he thought the bullet was of a different brand. I think it isn't directly refuted. There's no evidence to refute it. But his testimony, I think, has to be examined for what it is. His basis for believing that they were Remington's. And he didn't examine the bullets. In the record, it shows you. No, it is not the strongest evidence in the world. I mean, there certainly are some troublesome things in this case. I'm just trying to figure out if they're troublesome enough to get us over these three hurdles of standard of review. He saw a green box. The 9-millimeter bullets were in a green box. And then he's recollecting, well, I thought they were Remington's because the box was green. There were also loose bullets in the toolbox. He didn't examine those. And by his own admission, he didn't open the green box to actually check the bullets to see what kind of bullets were being kept in that green box. He assumed it was Remington's because the box was green and yellow. And I think that's not a strong basis for concluding that there were no skid marks. No, but it's all we got. Right? But it's all we have. I mean, in terms of good faith, that seems to be pretty relevant evidence to support the factual finding by the state court that there was good faith. Well, I think fundamentally, the fundamental, the most troubling, the central problem with the state court's conclusion is that even assuming that he believed they were Remington's, you still have 9-millimeter ammunition and no 9-millimeter weapon. And that doesn't prove Mr. Reed's innocence, but it's relevant. It's relevant evidence. And his testimony, I just didn't think that was relevant. I just think that's under those circumstances and the facts of how the homicide took place, that it was in combat at close quarters and they struggled over the weapon. Both men touched the weapon. And Reed's defense theory was self-defense. It was self-defense, indeed. That was his only theory of defense. The victim, by the way, had powder burns on both hands. All right. Counsel, you're way over your time. Thank you. I apologize. That's all right, because we asked you a lot of questions. But I think we should hear from the other side. Good morning. California Deputy Attorney General Ryan Smith, full respondent. Your Honors, the Los Angeles County Superior Court held an evidentiary hearing on this issue and made factual findings. The California Court of Appeal handled this issue on direct appeal and issued a written opinion on the matter. In relying on the facts before the court, the California Court of Appeal reasonably determined that Detective Lowe did not act in bad faith in destroying the ammunition. Thus, under ADEPA, this court must affirm the district court's decision to deny petitioners' petition for rid of Habeas Corpus. What is the evidence as to when the officer got rid of the 9-millimeter bullets? Well, according to the testimony at the evidentiary hearing, Cisneros contacted Detective Lowe about six months after the murder and actually a couple weeks after the preliminary hearing about this ammunition, about some weapons that she had of her husband's. At that point in time, Detective Lowe, feeling sorry for Cisneros because she had lost her husband, had no job, had two kids to raise, offered to help her out by purchasing what at the time he thought were weapons. Went to the house, got to the house. Isn't that pretty extraordinary? I mean, officers don't go around typically paying hundreds of dollars for widows of victims, particularly when their testimony isn't obviously or necessarily critical to the case. I mean, so that all seems pretty unusual. Yeah, I think unusual is a good word for it. Definitely it may not have been a wise decision for Detective Lowe to make this purchase, but his intention at the time was good and there was no ---- And all we have, his intent, the only evidence we really have on it is what he says, but some of what he says is just inherently incredible. It just seems incredible to me that an officer of 24 years' experience, having gone through the preliminary hearing, having been present at the preliminary hearing, knowing the theories of both the prosecution and the defense, and the type of gun that was used, would not think it was relevant that there were 9mm caliber bullets in the victim's house, which of course would support and just on its face supports the defense theory, but if the defense had had an opportunity to analyze those bullets, it might have even further bolstered the defense theory. It just seems incredulous to me that an officer of that amount of experience and with the knowledge that he had wouldn't even give them to the prosecutor so the prosecutor could decide whether it was braiding material that needed to be given to the defense. And that's compounded by the fact that he testified himself that he kept the guns until the end of the trial because he thought that, you know, why? Why would he do that? He had to think it was somewhat relevant. Well, I think all that goes to the fact that yes, Detective Lowe made an unwise decision, but the standard is, did he act in bad faith at that time? And all those facts actually go to the fact that he had... What does bad faith mean? Bad faith is that he had the intention to purposely deceive or destroy evidence. He knew that it was exculpatory when it was destroyed, and he purposely destroyed that evidence or let it become destroyed for that simple fact because he knew it was relevant evidence. And at that time... If you make that, I mean, if you assume that he knew it was relevant evidence, then why would he have put it in the police storage room for a while? And why would he have said that he was holding it until after the trial? Well, I think that goes to the fact that he really did this with the intent to help Cisneros. He did not do this to deceive anybody. He really didn't have plans on, oh, I'm going to buy these weapons. I'm going to use them for this. He was actually helping her. The fact that he held on to it didn't really know what he wanted to do with it. In fact, he ended up saying that maybe they spent the 9-millimeter shells out in the desert shooting it with family members. It was just, there was no attempt. He doesn't have a personal gun that would fire a 9-millimeter, does he? I don't know offhand if that was ever determined, if he had a 9-millimeter. I may be confused on that. I thought I had read that someplace, but maybe not. It very well may be the case. We can check and see. I thought that the only reason, or he had testified that the only reason the 9-millimeter bullets were gone was because he only had guns that could fire 9-millimeter bullets, something along those lines. But factually clarify something for me, if you would, Counsel. When Mrs. Cisneros contacted the detective, was there already an agreement over the phone that he would take some guns off of her hands, or did that not get negotiated until he actually showed up? At that point in time, I believe how the record goes is that when Cisneros called him, she told him her situation, that she was in financial trouble. And at that time, Detective Lowe made the determination that he had felt sorry for her, and he informed her that he would help her out with the weapons. And when he went there to actually purchase the weapons, he went with another detective, a partner, correct? That is correct. Well, did the partner get called at the evidentiary hearing, and was he able to shed light on what the circumstances were? There was a detective, there was a Detective Edelberry that called, and he was actually one of the original investigating officers at the murder, but I don't believe it was the actual detective that went to the Cisneros' home with the detective at that point in time. So there was or was not a detective that accompanied him to the home? Pardon me, I'm sorry. There was or was not another detective that accompanied him there? There was a detective that accompanied him to the home, but I don't believe that detective testified at the evidentiary hearing. Was this particular detective whose conduct is being challenged, was he the I.O., the investigating officer for this murder case? Yes, him and a Detective Edelberry were the two investigating officers of the case, yes. Your Honors, under the ADEPA standard, the California court's decision was a reasonable determination of the facts before it at the time. The court relied on the fact that it was Cisneros that contacted the detective, that the detective and Cisneros testified that there was no condition placed on the purchase of the weapons, like for her testimony or to testify a certain way. In fact, a preliminary hearing testimony had already occurred, that Detective Lowe testified he purchased the weapons and the ammunition because he felt sorry for Cisneros, and finally that the detective actually did make a note in his notes, I give you the fact that he did not write it down in the murder book, but he did write it in his notes on the murder trial, which were turned over to the defense, and in fact it was the defense, because of these notes, that found the discrepancy between what was written in the notes and the murder book. And Detective Lowe issued a receipt to Cisneros. All these facts determined, made it reasonable for the court of appeal, the California court of appeal, to determine that he did not act in bad faith. And unless the court has any further questions, we'll submit it at this time. How specific was the receipt, by the way? Did it detail the fact that 9mm bullets were purchased from her? I know the receipt stated the serial numbers of the guns that were purchased and the type of the guns, and I believe four boxes of ammunition, but I don't believe it broke it down to the three boxes of .40 caliber and one box of 9mm. The note, was it introduced in trial to support the defense theory? Pardon me? Was the note introduced at the trial to support the defense theory? I'm not sure if the note was actually introduced. I know that Detective Lowe was examined about this transaction and everything that occurred on it. The court actually offered a sanction because of the activity, stating that the detective could not refer to the type of brand that he thought that he had purchased, and then the court actually gave an instruction on it also. This is a really troubling case. I mean, I realize that we have the AEDPA standard, but what this officer did just really seems very not consistent with ordinary police procedures, especially by the investigating officer. It's very troublesome. I mean, I understand Your Honor's concern, and, again, Detective Lowe's behavior was not appropriate, but it did not lie to a constitutional violation for a defendant because he did not operate in bad faith when he made the purchase. This is exactly what Youngblood was trying to prevent, where any type of evidence that could be automatically caused for dismissal of the case. You don't think alarms went off when, because what he testified to wasn't that he, what he testified to was that Mrs. Naros called him and said that there's a red box and I think it contains ammunition. Wouldn't that have just set off alarm bells that the victim had guns in the house or was suspected to have guns in the house and there's no record, no police record made of that? No, that would not at that point in time, because actually the record shows that approximately one week, let me go back actually to the night of the murder, Mrs. Naros told the officers that her husband did have weapons and ammunition in the apartment somewhere, but she did not know. Approximately one week later, the police learned that Alvarez had two registered .40 caliber weapons in his possession. They were registered in his name. So at that point in time, the officers knew that Alvarez had guns, so when he received that call, no, it really wouldn't throw off anything other because they already were aware. The fact of the matter is the police's theory was, and the evidence showed that it was Reed, the petitioner that had the weapon. There was a witness at the crime scene, a demilow. He was a resident in the apartment complex. He saw a petitioner running his hand across the top of the gun. He thought maybe the gun had actually jammed or maybe he was just cocking the gun and then go back to Alvarez and that's when he heard the four gunshots. That evidence alone undermines the theory that this evidence is even relevant to the case because it was petitioner who had the gun prior to the shooting and who killed Alvarez. Just out of curiosity, does the record reflect whether Officer Lowe ever was disciplined in this process? It does not reflect that. Okay. Thank you. All right. Thank you, counsel. Thank you, counsel. Reed v. Cate will be submitted. We'll take up United States v. Leon.
judges: Ebel, Wardlaw, Nguyen